

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. PD-0268-21
---

**DARYL JOE, Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TENTH COURT OF APPEALS
### NAVARRO COUNTY
---

**WALKER, J., filed a dissenting opinion.**

### <u>DISSENTING OPINION</u>

In reviewing the sufficiency of the evidence to support Appellant's conviction for cargo theft, the Court today finds the evidence sufficient to show that the mattresses here were "cargo." I disagree. The mattresses here were not yet "cargo" within the meaning of the statute—the mattresses had not yet left their point of origin and were not yet a commercial shipment of freight moving in commerce. The evidence is insufficient to support cargo theft, and there is no need to have the court of appeals examine the "conducted an activity" element of cargo theft. Cargo theft is done. What we should be remanding for is a determination of whether the conviction can be reformed to attempted

cargo theft, regular theft, or attempted theft. I respectfully dissent.

## I — "Cargo"

To be guilty of one kind of cargo theft, a person must have knowingly or intentionally conducted, promoted, or facilitated an activity in which he received, possessed, concealed, stored, bartered, sold, abandoned, or disposed of stolen cargo, or cargo explicitly represented to him as being stolen cargo. TEX. PENAL CODE Ann. § 31.18(b)(1).[1] The statute gives a specific definition for "cargo," as:

> goods, as defined by Section 7.102, Business & Commerce Code, that constitute, wholly or partly, a commercial shipment of freight moving in commerce. A shipment is considered to be moving in commerce if the shipment is located at any point between the point of origin and the final point of destination regardless of any temporary stop that is made for the purpose of transshipment or otherwise.

*Id.* § 31.18(a)(1).

In Appellant Daryl Joe's case before us, the evidence showed that the mattresses were manufactured at the mattress company's factory. The finished mattresses go on a line down to the mattress company's shipping dock within the same premises. At the shipping dock, the mattresses are loaded into trailers. Once a trailer is completely full, the employees put the paperwork for the shipment, including a red seal, inside the trailer. Using a yard truck (or "yard dog"),[2] they pull the trailer out onto the shipping yard, close the trailer's doors, and "drop it."[3] The employees then seal

---

[1] The statute also provides a second form of cargo theft, specifically targeting persons employed as drivers lawfully contracted to transport specific cargo, who fail to deliver the entire cargo or who cause the seal of the of the cargo's container to be broken. TEX. PENAL CODE Ann. § 31.18(b)(2).

[2] Rep. R. vol. 3, 102.

[3] *Id.* at 101.

the trailer with a yellow seal. When a driver comes to take the trailer, he breaks the yellow seal, opens the trailer, retrieves the paperwork including the red seal, and then seals the trailer using the red seal.

Appellant drove his truck to the shipping yard of the mattress company and backed his truck under a sealed trailer loaded with mattresses. Before he could connect the lines and raise the jacks on the trailer, he was stopped by employees of the mattress company. Appellant then drove away without the trailer.

The Court today concludes that the evidence was sufficient to show that the mattresses were cargo, as defined by the statute, because the mattresses were moved from the factory to the shipping yard by the yard truck. As the Court sees it, the shipping yard was not part of the "point of origin"—the factory alone is the "point of origin," regardless of how close the shipping yard was to the factory or the fact that both were owned by the mattress company. Additionally, the Court suggests the shipping yard was a temporary stop for the trailer. Thus, from the moment the mattresses were moved from one part of the facility to another, they had left their point of origin and were moving in commerce.

## II — "Point of Origin" Is Where The Shipment Begins

Viewed entirely in a vacuum, there is some merit to the Court's interpretation. But "point of origin" does not exist in a vacuum. Based upon the language of the statute itself, based upon the Legislature's use of "point of origin" elsewhere, and based upon the statute's history, "point of origin" is not a phrase to be read according to its ordinary meaning. It must be viewed in the context of shipping.

Although the statute does not provide a definition for "point of origin," the statute gives

strong clues as to the meaning of "point of origin" by the very words used, which all heavily imply the shipping industry. The statute defines "cargo" as goods that constitute a **commercial shipment** of **freight** moving in **commerce**. TEX. PENAL CODE Ann. § 31.18(a)(1). It provides that the **shipment** of **freight** is considered moving in **commerce** even if it is temporarily stopped for **transshipment**. *Id.* A "shipment" is "The act of shipping goods . . . The goods shipped." WEBSTER'S II NEW COLLEGE DICTIONARY 1019 (Houghton Mifflin Co., Boston 1999). "Freight" is "Goods transported by a vessel or vehicle, esp. goods transported as cargo by a commercial carrier . . . Commercial transportation of goods." *Id.* at 447. The mattresses can hardly be called a shipment of freight (the commercial transportation of goods by a commercial carrier) when they are individual mattresses going down the line from the factory to the shipping dock, all the while managed by the mattress company's own employees. Other words may be more accurate, such as "product," "merchandise," or "goods" in its ordinary meaning. The mattresses are a "shipment of freight" when they are inside a loaded trailer being driven on the highway by a truck to a mattress store, after they have already been picked up by the truck driver and taken away.

"Transshipment" appears only once in the Penal Code (this statute, § 31.18), but it appears in three other statutes.[4] None of those statutes gives "transshipment" a definition, but they all clearly

---

[4] TEX. AGRIC. CODE Ann. § 122.352 ("It is the policy of this state to not interfere with the interstate commerce of hemp or the **transshipment** of hemp through this state.").

TEX. INS. CODE Ann. § 1807.001(2)(A)(i)(b)(4) ("In this chapter: . . . (2) 'Marine insurance' means: (A) insurance and reinsurance that covers: (I) loss or damage to: . . . (b) insurable property and interests in respect to, appertaining to, or in connection with a risk or peril of navigation, transit, or transportation: . . . (4) during any delay, storage, or **transshipment** or reshipment incident to the initial shipment").

TEX. BUS. & COM. CODE Ann. § 9.312(f)(2) ("(f) A perfected security interest in a negotiable document or goods in possession of a bailee, other than one that has issued a negotiable document

implicate the shipping industry. Indeed, the ordinary definition of "transshipment" reflects that it is a term in the shipping industry to reflect a change of the boat or vehicle after the cargo has already been shipped. *See Transshipment*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("(18c) *Maritime law*. The act of taking cargo out of one ship and loading it on another. Transshipment may also involve transfer of cargo to another mode of transportation, such as rail or truck."); *Transship*, WEBSTER'S II NEW COLLEGE DICTIONARY 1172 (Houghton Mifflin Co., Boston 1999) ("To transfer from one vessel or vehicle to another for reshipment. . . . To transfer cargo from one vessel or vehicle to another").

The statute also explicitly tells us that "goods" has the definition provided by § 7.102 of the Business and Commerce Code. TEX. PENAL CODE Ann. § 31.18(a)(1). That statute says:

> "Goods" means all things that are treated as movable for the purposes of a contract for storage or transportation.

TEX. BUS. & COM. CODE Ann. § 7.102(a)(7). As relevant to the cargo theft statute, "goods" are "things that are treated as movable for the purposes of a **contract for . . . transportation**." There is no "contract for transportation" when goods are moved from one part of the mattress company's premises to another. The employees overseeing the mattresses going down the line from the factory to the shipping dock do not negotiate and execute contracts to transport the mattresses with the factory and the shipping dock, nor does the driver of the yard truck moving the loaded trailer from the shipping dock to the shipping yard negotiate and execute contracts to transport the mattresses with the shipping dock and the shipping yard. He just moves them from one part of his job site to

---

for the goods, remains perfected for 20 days without filing if the secured party makes available to the debtor the goods or documents representing the goods for the purpose of: . . . (2) loading, unloading, storing, shipping, **transshipping**, manufacturing, processing, or otherwise dealing with them in a manner preliminary to their sale or exchange.").

another as part of his job duties with the mattress company. Who negotiates and executes contracts to transport the mattresses with the mattress company? The trucking companies who take the loaded and sealed trailers from the shipping yard.[5]

The definition of "goods" neatly dovetails into § 31.18(a)'s use of "cargo," being a "commercial shipment of freight" that is moving in "commerce," even if it is temporarily stopped for "transshipment."

As for "point of origin" itself, that phrase appears only twice in the Penal Code, with both instances occurring within § 31.18. Section 31.18(b)(2) sets out another way of committing cargo theft:

> (b) A person commits an offense if the person:
>
> > (2) is employed as a driver lawfully contracted to transport a specific cargo by vehicle from a known *point of origin* to a known point of destination and, with the intent to conduct, promote, or facilitate an activity described by Subdivision (1), knowingly or intentionally:
> >
> > > (A) fails to deliver the entire cargo to the known point of destination as contracted; or
> > >
> > > (B) causes the seal to be broken on the vehicle or on an intermodal container containing any part of the cargo.

TEX. PENAL CODE Ann. § 31.18(b)(2) (emphasis added). This provision clearly refers to truck drivers

---

[5] I do not dispute that the mattresses in the trailer were "goods" within the meaning of Business and Commerce Code § 7.102(a)(7). There was testimony that the J.B. Hunt trucking company was the in house third party carrier for the mattress company; that the trailer loaded with mattresses in this case was a J.B. Hunt trailer; and that the J.B. Hunt trailer was awaiting pickup by a J.B. Hunt driver. The mattresses were things treated as movable for the purposes of a contract for transportation.

But the J.B. Hunt trailer full of mattresses—the goods—were not yet a commercial shipment of freight moving in commerce, located at any point between the point of origin and the final point of destination.

in the cargo shipping industry.

Additionally, the Legislature has used "point of origin" several places outside of the Penal Code.[6] The vast majority of these instances are found in the Transportation Code and the Agriculture Code. The Transportation Code provisions directly implicate and refer to things that are already moving on the roads. *See, e.g.*, TEX. TRANSP. CODE Ann. §§ 622.041 (providing that vehicles carrying timber may operate on the road if the distance between point of origin and point of destination is under 125 miles), 623.123 (application for permit to move portable building units must indicate where the portable building unit is from), 623.0172 (requiring intermodal shipping containers to be continuously sealed while in transit from point of origin to point of destination). The Agriculture Code provisions similarly involve shipping, specifically of animals and plants. *See, e.g.*, TEX. AGRIC. CODE Ann. §§ 146.005 (permits to transport animals), 71.0091 (providing for seizure of infected or infested citrus plants transported through the state, with return to the point of origin if feasible). Notably, § 622.041 of the Transportation Code defines "point of origin" for the purposes of that statute:

---

[6] TEX. TRANSP. CODE Ann. §§ 502.095, 502.492, 503.001, 503.069, 551A.057, 551A.058, 622.041, 623.0172, 623.123, 623.406.

TEX. AGRIC. CODE Ann. §§ 71.009, 71.0091, 71.103, 71.111, 146.005, 164.063, 167.027, 167.028, 167.105.

TEX. TAX CODE Ann. §§ 162.115, 162.116, 162.118, 162.216, 162.217, 162.219, 162.224.

TEX. HEALTH & SAFETY CODE Ann. §§ 382.003, 753.005.

TEX. GOV'T CODE Ann. §§ 51.806, 660.092.

TEX. CODE CRIM. PROC. Ann. art. 18A.001.

TEX. LOC. GOV'T CODE Ann. § 235.003.

> A person may operate over a highway or road of this state a vehicle or combination of vehicles that is used exclusively for transporting poles, piling, or unrefined timber from *the point of origin of the timber (the forest where the timber is felled)* to a wood processing mill . . . .

TEX. TRANSP. CODE Ann. § 622.041(a) (emphasis added). The point of origin for timber is the forest where the timber is felled, not the location of the tree stump. If mattresses were trees, it could stand to reason that the point of origin for the mattresses is the forest where the mattresses are felled (the mattress company's premises, factory and shipping yard), not the stump of the mattress tree (the factory alone).

If the Legislature's aim was to have the offense of cargo theft apply any time goods are moved, it would not have gone to the effort of speaking in terms of shipments, of freight, of commerce, of point of origin, of point of destination, and of transshipment. Viewed in the light of these provisions, and the very nature of the offense of cargo theft, the import is clear: the statute should be read as specifically covering activity in the cargo shipping industry. "Point of origin" should be read in the light of that context, and it means the place where shipment begins, not the birthplace of the goods. The "point of origin" is the place where the goods have been transferred from the shipper to the carrier, and from the point of origin, the carrier transports the goods to the goods' final point of destination. The majority of the Court, construing "point of origin" to mean the place where the mattresses originated, ignores everything around "point of origin" indicating that "point of origin" is a term of art for the shipping industry.

Viewed in strict isolation, however, the majority's interpretation is not unreasonable. Assuming that our differing interpretations are both reasonable, the meaning of "point of origin" is arguably ambiguous, and if that is the case, extratextual factors would be helpful to figure out what

"point of origin" means. *See Boykin v. State*, 818 S.W.2d 782, 785–86 (Tex. Crim. App. 1991) ("if

the language is not plain but rather ambiguous, then . . . is it constitutionally permissible for a court

to consider, in arriving at a sensible interpretation, such extratextual factors as executive or

administrative interpretations of the statute or legislative history."). The Bill Analysis for § 31.18

provided:

> Cargo theft by organized crime rings has become a very serious problem in this state. By some estimates, Texas leads the nation in the incidence of cargo theft, with losses valued at $23 million between 2012 and 2014. Furthermore, existing Penal Code provisions addressing theft and organized crime present significant impediments to the prosecution of this activity. For example, an element of the crime of theft is the appropriation of property without the owner's effective consent. In cargo theft cases involving collusive drivers, however, the initial bailment of the property is consented to by the owner, making it difficult to establish at what point the driver's conduct vitiates the owner's consent for purposes of charging theft. This bill would remedy that problem by creating a separate category of offense called "cargo theft" and providing that failure to deliver cargo to its destination as contracted, or causing the seal to be broken on a vehicle containing the cargo, completes the offense, subject to general mens rea provisions.

> Another impediment to prosecuting cargo theft under current law results from the fact that most cargo theft is undertaken by sophisticated, organized crime rings. Under current law, a person found in possession of stolen property may be prosecuted individually, but to reach others involved in the theft under Texas' organized crime statue would require the prosecutor to establish a "combination" of "three or more persons who collaborate in carrying on criminal activities"—a very difficult showing to make. What's more, under the standard punishment "ladder" for theft, low-value thefts can be prosecuted as misdemeanors. While this might be a suitable deterrent for amateur or opportunistic criminals, it is radically under-deterrent against organized crime syndicates that employ expendable "pawns." This bill would address both issues by making any theft of cargo a state jail felony at a minimum, and up to a first degree felony for thefts of $200,000 or more, and by providing that anyone who "knowingly or intentionally conducts, promotes, or facilitates an activity" involving the receipt, possession, concealment, storage, sale, or abandonment of stolen cargo is guilty of the offense of cargo theft.

S. Comm. on Crim. Just., Bill Analysis at 1, Tex. S.B. 1828, 84th Leg., R.S., (2015). While not

determinative, this statement of intent aligns with the statute's focus on goods that are already being

shipped, and not merely waiting at a shipping yard for a trucker to pick them up.

For the mattresses, their "point of origin" will be where the mattresses are picked up by a carrier to be transported to their destination. It is not merely the factory where they were made. Until the mattresses are taken away by a truck driver, they do not leave their point of origin. The entire mattress company premises—factory and shipping yard—were the point of origin. The mattresses did not move in commerce, and they do not count as "cargo" for the purposes of the cargo theft statute.

### III — Conclusion

"Cargo" involves "goods," consisting of a "shipment" of "freight" moving in "commerce" between its "point of origin" and its final "point of destination." The clear implication is that the cargo theft statute focuses upon goods that are in shipping containers and that are actively being transported on our roads, our highways, our railways, and our waterways. They are not goods that have been moved from a factory to a shipping yard within the same premises, where they are prepared for and are waiting to be picked up and shipped. The mattresses in this case did not leave their point of origin, and they were not moving in commerce. The evidence is not sufficient to show the mattresses were "cargo" within the meaning of § 31.18, and the evidence is not sufficient to support Appellant's conviction for cargo theft.

Accordingly, there is no need to remand this case for the court of appeals to consider the evidence of another element of cargo theft. At most, the court of appeals on remand should consider whether Appellant's conviction should be reformed to *attempted* cargo theft, regular theft, or attempted theft. *See Thornton v. State*, 425 S.W.3d 289, 299–300 (Tex. Crim. App. 2014). I respectfully dissent.

Filed: June 22, 2022
Publish